229 So.2d 426 (1969)
Santelle ARDOIN, Plaintiff-Appellee,
v.
The TRAVELERS INSURANCE CO., Defendant-Appellant.
No. 2874.
Court of Appeal of Louisiana, Third Circuit.
December 11, 1969.
Dissenting Opinion December 15, 1969.
Rehearing Denied January 7, 1970.
*428 Dubuisson & Dubuisson, by William A. Brinkhaus, Opelousas, for defendant-appellant.
Preston N. Aucoin, Ville Platte, for plaintiff-appellee.
En Banc.
HOOD, Judge.
Plaintiff, Santelle Ardoin, instituted this action for damages for personal injuries allegedly sustained by him as the result of a collision between a pick-up truck being driven by Ardoin and a tractor-trailer combination owned by Wheeling Pipe Lines, Inc., and being driven by its employee, Doyle Vickers. The suit was instituted against Travelers Insurance Company, insurer of the tractor-trailer. Judgment on the merits was rendered by the trial court in favor of plaintiff, awarding him damages in the sum of $23,364.45. Defendant appealed, and plaintiff has answered the appeal seeking an increase in the amount of the award.
The principal issues presented are: (1) Was defendant's insured negligent? (2) Is plaintiff barred from recovery by his own contributory negligence? (3) Did the trial judge err in excluding some medical testimony which was tendered by defendant? (4) Is the award excessive or inadequate?
The accident occurred about 6:15 a. m. on September 13, 1967, on U. S. Highway 167 in Evangeline Parish, Louisiana. The highway at that point is a straight, level, two-lane, paved thoroughfare, running north and south. It was almost daybreak and the sky was beginning to get light when the collision occurred. The road was dry and visibility was good execpt that there were patches of ground fog in that area.
When the vehicles collided, Ardoin was driving his pick-up truck south on the highway at a speed of from 15 to 35 miles per hour. The larger Wheeling truck was behind the Ardoin vehicle, and it was being driven in a southerly direction by Vickers at a speed of about 45 or 50 miles per hour. Another Wheeling tractor-trailer, driven by Louis Conners, was immediately behind and was following the vehicle which was being driven by Vickers. The drivers of both of these tractor-trailer combinations testified that their headlights were burning, and that the fog did not prevent them from seeing a substantial distance ahead of them. The speed limit for trucks on that highway was 50 miles per hour.
The collision occurred in the south-bound lane of traffic on the highway. The right front part of the Wheeling tractor-trailer combination struck the left rear part of the Ardoin pick-up truck. Vickers testified that he was from 75 to 100 feet from Ardoin when he first saw the latter's pick-up truck ahead of him, and that upon making that observation he immediately veered to his left into the north-bound lane of traffic in an unsuccessful attempt to avoid a collision. He stated that Ardoin's truck was dirty, that it was painted a dark color, and that neither its headlights nor its taillights *429 were burning when the accident occurred.
The evidence shows that the Ardoin truck was old and that it was dark green in color. It was equipped with one taillight located on the left rear part of the truck, but this taillight was broken as a result of the collision. The evidence does not establish that the pick-up truck was dirty or dusty enough to obscure or cover up the taillight. The State Trooper who investigated the accident testified that the headlights of the pick-up truck were not burning when he arrived at the scene about 6:50 a. m., but Edward Fontenot, who arrived immediately after the accident occurred and notified the State Police of it by telephone, stated that the headlights of Ardoin's vehicle were burning when he got there and that he turned them off before the State Trooper arrived. The testimony of other witnesses relating to the question of whether the headlights and the taillight of the pick-up truck were burning at the time the collision occurred is conflicting. The trial judge concluded that the lights of the Ardoin truck were burning at that time, however, and we agree with him that the evidence preponderates to that effect.
The general rule, subject to some exceptions, is that a motorist is held to have seen an object which, by the use of ordinary care and prudence, he should have seen in time to avoid running into it, and that the driver of a motor vehicle is guilty of negligence in driving at a rate of speed greater than that in which he could stop within the range of his vision. Geoghegan v. Greyhound Corporation, 226 La. 405, 76 So.2d 412 (1954); McCandless v. Southern Bell Telephone & Tel. Co., 239 La. 983, 120 So.2d 501 (1960); McGee v. Southern Farm Bureau Casualty Ins. Co., 125 So.2d 787 (La.App. 3 Cir. 1961); Lewis v. Quebedeaux, 134 So.2d 93 (La.App. 3 Cir. 1961); Thibodeaux v. Jack's Cookie Corporation, 169 So.2d 918 (La.App. 3 Cir. 1964); Broussard v. State Farm Mutual Automobile Ins. Co., 188 So.2d 111 (La.App. 3 Cir. 1966); and Davis v. St. Louis Fire and Marine Insurance Co., 200 So.2d 910 (La.App. 1 Cir. 1967).
When visibility is materially impaired because of smoke, mist, dust, fog or other atmospheric conditions, a motorist is held to a duty of operating his vehicle with an unusually high degree of care. He should reduce his rate of speed to such an extent, and keep his vehicle under such control as to reduce to a minimum the possibility of accident from collision. And, as an extreme measure of safety, it is his duty when visibility ahead is not possible or is greatly obscured, to stop his vehicle and remain at a standstill until conditions warrant going forward. He does not have the right to assume that his course of travel is free from danger or obstruction in the absence of his ability to see clearly ahead, and if he continues to travel as if he knew there was perfect clearance ahead, he does so at his own risk and peril. Culpepper v. Leonard Truck Lines, 208 La. 1084, 24 So.2d 148 (1945); Demerest v. Travelers Insurance Company, 234 La. 1048, 102 So.2d 451 (1958); Ardoin v. Southern Farm Bureau Casualty Ins. Co., 133 So.2d 129 (La.App. 3 Cir. 1961); Moses v. Mosley, 146 So.2d 263 (La.App. 3 Cir. 1962); and Hernandez v. State Farm Mutual Automobile Ins. Co., 192 So.2d 679 (La.App. 3 Cir. 1966).
The testimony in the instant suit is conflicting as to the extent to which visibility was impaired by fog and darkness at the time of the accident. The drivers of both of the Wheeling trucks which were approaching plaintiff from the rear, however, conceded that they could see 300 to 400 feet ahead of their vehicles while their lights were burning. Under those circumstances, we find that Vickers, the driver of the insured truck, was negligent in failing to observe plaintiff's pick-up truck ahead of him in time to avoid a collision, and that *430 his negligence in that respect was a proximate cause of the accident.
We also conclude, as did the trial judge, that plaintiff Ardoin was free from contributory negligence, and that he thus is entitled to recover the damages which he sustained as a result of the accident.
After the accident occurred, plaintiff was taken to the Ville Platte Medical Center where he was hospitalized and treated by Dr. R. K. Vidrine, a general practitioner of medicine and surgery. He remained in the hospital until September 18, 1967. He was again hospitalized from October 9 to October 18, 1967, during which time he was treated by Dr. Charles J. Aswell, a general practitioner and surgeon. Plaintiff also was examined by several other doctors some of whom testified at the trial or by deposition.
Dr. Vidrine examined plaintiff on the date of the accident, and he has treated him periodically since that time. He diagnosed Ardoin's condition as "cervical strain; lumbodorsal strain; contusions and hematoma of the right leg, followed by thrombophlebitis of the right leg." He testified that plaintiff recovered from the cervical and lumbodorsal strains within a period of about two months after the accident, and that he recovered from the hematoma within three or four weeks. He feels, however, that plaintiff is still suffering from a deep vein thrombophlebitis which he relates to the accident, and the treatment which he has administered to plaintiff has been principally for that thrombophlebitis, although he also has been treating him for high blood pressure and nervousness. Dr. Vidrine concedes that plaintiff suffered from hypertension and high blood pressure prior to the collision, but he feels that these conditions were aggravated and made worse by that accident. He stated that plaintiff may recover enough to "run his tractor and things of that sort, but he won't be able to make fences, do real strenuous work."
Dr. Charles J. Aswell treated plaintiff from October 9 to October 18, 1967, at the request of Dr. Vidrine and while the latter was otherwise occupied. Plaintiff was hospitalized during that period of treatment. Dr. Aswell diagnosed plaintiff's injuries as "contusions of right leg and secondary infection. Hematoma of leg; contusions of back and neck." It is significant, we think, that he did not find that plaintiff had thrombophlebitis while this treatment was being administered.
Dr. Robert L. Bordelon, an orthopedic surgeon, examined Ardoin on November 21, 1967, and again on January 12, 1968, at the request of Dr. Vidrine. As a result of the first examination, Dr. Bordelon concluded that plaintiff had sustained a cervical strain, a lumbar strain, a strain of the right knee, and a contusion of the right leg. He felt that plaintiff's difficulties resulted from the superimposition of these strains on degenerative osteoarthritis. As a result of the second examination made six or seven weeks later, Dr. Bordelon concluded that although plaintiff was "possibly symtomatic" as a result of the accident he had no serious physical impairment, and he had no internal derangement of the knee. He felt that any symptoms which Ardoin may have had were due to residual scarring, and that he would recover within six to twelve weeks thereafter. Dr. Bordelon testified that he examined plaintiff's knee and leg closely and he found no signs of thrombophlebitis. He stated that he thought he would have noted any such signs if they actually had been present. We assume that Dr. Bordelon examined Ardoin especially for thrombophlebitis, since that was the principal condition for which the referring physician, Dr. Vidrine, had been treating him.
Dr. Edgar P. Breaux, a general surgeon who has had extensive experience in treating thrombophlebitis cases, examined plaintiff at Dr. Vidrine's request on April 11, 1968. He concluded that Ardoin had sustained "contusions and abrasions of the long saphenous system and questionably to the deep veins of his leg." He could find no evidence of a "deep-vein blockage" or *431 deep-vein thrombophlebitis, however, and he testified that the deep veins are the important ones in checking for phlebitis. He found no infection, no cellulites, no redness, no fever, and no other signs of thrombophlebitis. He assumed from the history and from the treatment which had been administered by Dr. Vidrine that Ardoin had had a phlebitis, but he concluded that it must have been a superficial thrombophlebitis, that there would be no permanent residuals from it, and that plaintiff had a good prognosis for full recovery.
On July 9, 1968, apparently at the request of plaintiff's attorney, Ardoin was examined by Dr. D. H. Texada, Jr., a neuropsychiatrist of Alexandria, Louisiana. Dr. Texada performed a neurological examination of plaintiff which was normal in all respects. He examined plaintiff's right leg and it appeared to be normal, so he concluded that there was no physical basis for plaintiff's complaints. A psychiatric examination also was performed, but it was unsatisfactory since plaintiff spoke very little English, and most of the history had to be obtained from Mrs. Ardoin. As a result of the examination, Dr. Texada diagnosed plaintiff's mental condition as an "involutional depression with early cerebral arteriosclerosis." In his opinion, plaintiff would have developed this condition without the accident, but it was his feeling that the accident precipitated the onset of it.
We have concluded that there was a physical basis for some of plaintiff's complaints with reference to his knee, although his complaints were greatly exaggerated. Dr. Texada thus erred in concluding that the knee was normal and that there was no physical basis for his symptoms. The doctor testified that plaintiff "complained bitterly of pain with even minimal touch to the right knee, ankle, and thigh," and that his examination of the leg consisted of looking at it to determine if there was any visible edema. Also, apparently because of the language barrier and plaintiff's apparent attitude, Dr. Texada did not inquire as to whether he had entertained suicidal thoughts or had developed impotency since the accident, both of which are significant factors in diagnosing his state of depression. He did determine that plaintiff had experienced no loss of appetite since the accident, and that there had been no wasting of any muscles, both of which contra-indicated a severe depression. He stated that he would consider plaintiff's condition to be a "moderate depression," and that its pretty common for people with cerebral arteriosclerosis to develop this type of depression on reaching plaintiff's age (61 years) even without an accident. He made it clear that this was not an "objectively made diagnosis by any manner of means," and he testified that "frankly, in this man's case, a lot of this is based on the wife's history as well as the patient."
Dr. Samuel Karlin, a general surgeon of New Orleans and the founder of the Vascular Clinic at Touro Infirmary, examined plaintiff on October 8, 1969. He felt that Ardoin had sustained an extensive injury to the region of the right knee, but he did not believe that plaintiff was suffering from either a deep or a superficial thrombophlebitis. He recommended that plaintiff be examined by Dr. Howard Mahorner, a physician whom Dr. Karlin regarded as an expert in the field of thrombophlebitis.
Shortly before this case was tried on the merits, defendant filed a motion, pursuant to LSA C.C.P. Art. 1493, to have plaintiff reexamined by Dr. Edgar Breaux, or, in the alternative, by a vascular surgeon or a general surgeon of the Court's choice. This motion was resisted by plaintiff, and after a hearing the trial court eventually ordered that plaintiff be examined by Dr. Mahorner.
Pursuant to that court order, Dr. Howard Mahorner examined plaintiff on January 31, 1969. Dr. Mahorner is a surgeon who had five years of training in surgery at Mayo Clinic. He has taught surgery at the Medical Schools of Tulane and Louisiana State University. He is now a Professor *432 of Clinical Surgery at Louisiana State University. He has made a special study of thrombophlebitis, and he is the author of a number of articles on that subject. As a result of his examination of plaintiff, he concluded that:
"As far as the leg is concerned, this man may have had a thrombosis. It is not unlikely that he had one. But I do not think it was a severe thrombosis; I do not think that the deep venous system was badly compromised, because if it had been, he now would have more post-thrombophlebitic edema than he demonstrates now. * * *
"In my opinion the amount of edema now is not incapacitating. This man, as far as his leg is concerned and the question of thrombosis is concerned, ought to be able to do just what he did prior to the accident. Even though he had a little edema, if he had had the proper attitude and wanted to be rehabilitated and had the mental capacity to do so, I believe he would have recovered. * * *
"There is no indication for venous operation. There is no indication for a venogram to see whether that deep system is plugged or not. From the clinical standpoint the minimum edema that he has is not incapacitating. * * *
"This patient, in my opinion, is disabled now, but not from sequelae of thrombosis. He is deteriorating mentally and physically. There is a lot of falsification in the whole business. Whether he is sufficiently mentally acute or not to be doing this deliberately, I do not know. It appears to this examiner that he is showing a degree of malingering, whether he is doing it subconsciously or not."
Defendant contends that the trial judge committed error requiring a remand of this case in refusing to permit counsel for defendant to elicit certain testimony at the trial. Plaintiff placed a pharmacist on the stand and qualified him as an expert in the field of pharmacy for the purposes of identifying prescriptions which he had filled for the plaintiff, of testifying as to the costs of these drugs, and of giving the names of the drugs. On cross-examination, counsel for defendant attempted to elicit testimony from this witness concerning the illnesses for which these particular drugs might be prescribed and concerning illnesses for which a physician would not prescribe these drugs. Plaintiff timely objected on the ground that such testimony lies in the field of medical opinion and outside the field of pharmacy. The trial judge sustained that objection, and we agree that it was properly sustained.
Defendant complains that the trial judge erred in refusing to permit it to elicit testimony from two other medical witnesses who were present in court. Defendant had issued a subpoena to Dr. R. A. Fontenot, who was in court on the day of the trial. The trial judge, however, released Dr. Fontenot from the subpoena and defendant then was unable to obtain his testimony. Defendant stated that Dr. Fontenot had been plaintiff's treating physician prior to the accident, and that his purpose in calling him was to question him about plaintiff's physical, mental, and emotional condition prior to the accident. Although we think the trial judge erred in not permitting defendant to call the witness, we consider the error to be harmless in view of the other conclusions which we have reached as to plaintiff's injuries.
At the beginning of the trial, counsel for defendant moved to have plaintiff examined by Dr. James H. Blackburn, a psychiatrist, who was present in court. The examination was to be made during a recess and without delaying the trial, and plaintiff had not been examined by any other psychiatrist except Dr. Texada. The trial judge refused to order that psychiatric examination. Dr. Blackburn was permitted to sit through the trial, however, and when defendant called him as a witness plaintiff objected on the grounds that *433 Dr. Blackburn had never examined Ardoin. The trial judge sustained this objection and refused to permit Dr. Blackburn to testify. The questions which defendant's counsel proposed to ask Dr. Blackburn were hypothetical in nature, and were based upon evidence which had already been admitted through the testimony of other doctors. We think the trial court erred in sustaining plaintiff's objection to this testimony, but since our ultimate conclusion is that plaintiff has failed to prove that he sustained a psychiatric illness as a result of the accident, we feel that the trial judge's error was harmless, and that it does not require us to remand the case.
The trial judge held that plaintiff suffered a cervical strain, a lumbodorsal strain, multiple contusions and abrasions, a large hematoma of the right leg, and thrombophlebitis of the right leg, and he awarded plaintiff $15,000 for these injuries. In addition, the trial judge awarded plaintiff $5,000 for a psychosis which he found that plaintiff suffered as a result of the accident.
Our review of all the medical evidence convinces us that plaintiff has not carried his burden of proving that he suffered a psychiatric disorder as a result of the accident. The only diagnosis made to that effect was that of Dr. Texada who saw plaintiff only one time, and who based his evaluation solely on subjective information, most of which was obtained from plaintiff's wife. The evidence shows that plaintiff exaggerated his complaints, and that it was difficult for Dr. Texada to communicate with him because of a language barrier. Dr. Texada also made it clear that the emotional problem which plaintiff has is caused primarily from arteriosclerosis.
We also think that the medical evidence fails to support a finding that the plaintiff suffered deep vein thrombophlebitis in the right leg. In weighing medical opinions, our courts have held that the testimony of an attending physician ordinarily should be accorded more weight than that of physicians who had made an examination for purposes of diagnosis only. When the injury falls within a certain field of medicine, however, the testimony of the specialist in that field is usually entitled to greater weight than that of the general practitioner. Meche v. Maryland Casualty Company, 204 So.2d 719 (La.App. 3 Cir. 1968) and cases cited therein. In the instant suit Dr. Vidrine appears to be the only medical expert who feels that plaintiff has a deep-vein thrombophlebitis. Most of the other doctors, including specialists in that field of medicine, feel that he did not sustain such an injury. We believe that the testimony of Dr. Karlin and that of Dr. Mahorner, both of whom are specialists in the field of venous injuries, are entitled to more weight than that of the treating general practitioner. Neither of these two doctors felt that plaintiff had suffered deep-vein thrombophlebitis, and we feel that the other evidence also preponderates to that effect.
The medical evidence convinces us that plaintiff suffered a cervical strain and a lumbar strain, from which he recovered in approximately two months. In addition, plaintiff suffered multiple contusions and abrasions and a severe contusion of the right leg and knee which resulted in a superficial thrombosis, the residuals from which plaintiff was still suffering at the time of the trial. The evidence shows that plaintiff had high blood pressure and was a hypertensive person prior to the accident, and that these conditions continued after the accident with perhaps some aggravation. We find, however, that he has suffered no permanent residuals or disability as a result of the accident.
Taking all of these injuries into consideration, we feel that an award of $8,000 for the injuries and plaintiff's pain and suffering will do substantial justice. In reviewing the quantum in this case, we have considered the rule that the trier of fact is vested with "much discretion" *434 in awarding damages, and that the amount of damages awarded in other cases for similar injuries is relevant for determining whether the trier of fact abused its discretion. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Ballanga v. Hymel, 247 La. 934, 175 So.2d 274 (1965); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967).
We find that plaintiff has incurred hospital bills, doctors' bills, drug bills, and expenses of traveling to and from various doctors' offices in the total amount of $2,032.45. We also find that plaintiff has proved that he will require additional medication for an undetermined period of time, and we feel that an award of $150 is proper for this item. Plaintiff's 1951 Dodge pick-up was virtually a total loss as a result of this accident. The trial judge awarded $250 for the property damage to this truck and we find that such award is proper under the evidence presented.
Prior to this accident, plaintiff was a small farmer raising chiefly cotton and sweet potatoes. For several years, he and his wife had received help in harvesting their crops from relatives. However, in the year in which the accident occurred, plaintiff's wife was apparently unable to assist him in harvesting the crops and his relatives were no longer available. In fact, at the time of the accident, plaintiff was driving into Ville Platte to employ some farm labor. Plaintiff attempted to show, through the testimony of his wife, the amount of crop loss which he sustained as a result of the accident and which he would sustain in future years. As pointed out by the trial judge, the evidence on this particular point was confusing. We feel, however, that the evidence does establish a crop loss. The trial judge awarded $600 for this item, and we think such an award is justified. The trial judge also awarded $500 for extra labor which the plaintiff had to hire as a result of this accident. Defendant does not contend that this award was erroneous, and we have decided not to disturb it.
For the reasons herein assigned, the judgment of the trial court is amended by reducing the award made to plaintiff from the sum of $23,364.45 to the sum of $11,532.45, with interest thereon from date of judicial demand until paid, and for all costs, including the costs of this appeal. In all other respects, and except as herein amended, the judgment appealed from is affirmed.
Amended and affirmed.
FRUGE, J., dissents and agrees with the trial judge in every respect.
TATE, Judge (dissenting).
I respectfully dissent from the reduction of the award by nearly one-half.
The majority accomplishes this reduction by disallowing any recovery for psychiatric difficulty or for a deep-vein thrombophlebitis.
With regard to the latter injury, the attending physician first saw the patient on September 13, 1967, when he was brought to the emergency room of the hospital immediately after the accident. This doctor observed and treated the patient intensively during his initial hospitalization and afterwards right up to the trial more than a year later. Based on his months of treatment as well as his initial examination, this doctor was of the unequivocal opinion that the claimant sustained a deep-vein thrombophlebitis, an extremely serious and disabling injury undoubtedly justifying the award made.
*435 The majority reverses the trial court's finding on the basis primarily of the examinations by two specialists, Dr. Karlin and Dr. Mahorner. They opined that the patient had only sustained a superficial thrombophlebitis. Both of these specialists examined the claimant only once, and then more than a year after the accident.
Although both of them found some swelling and some residual symptoms, both of these specialists concluded on the basis of their superficial examinations that the patient was not disabled by the deep-vein thrombophlebitis. However, there is substantial evidence that the external residuals, upon which a diagnosis at this late date would be based, would not be apparent upon a single examination unless the elastic bandages had been removed for an extended period rather than only transiently for the brief examination.
Once again, we as an appellate court are incorrectly disturbing a trial court's finding of fact based upon substantial evidence, and once again we are improperly interfering with the statutorily-granted great discretion of the trial court to award damages. Civil Code Article 1934; Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127.
Likewise, in the face of uncontradicted psychiatric testimony, our majority finds psychiatric injury not proven.[1] The trial court accepted the testimony of the psychiatrist and the corroborating lay testimony, and the writer feels that once again we as a reviewing court are incorrectly disturbing the trial court's finding founded upon substantial evidence, based primarily upon our own speculations and predelictions against psychiatric recovery, rather than upon the preponderant evidence in the record, as properly accepted by the trial court.
For the reasons assigned, I respectfully dissent.

On application for Rehearing.
En Banc. Rehearing denied.
TATE, J., is of the opinion a rehearing should be granted.
FRUGE, J. votes for rehearing on quantum.
NOTES
[1] I do think that the defendant should have been permitted to make a psychiatric examination at the trial, as requested of however little weight such an adversary-directed during-trial opinion might be. The majority, however, does not reach this question. More confident than the defendant, which at least desired to rebut the uncontradicted testimony of psychiatric injury, our majority simply construes the latter away.